**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CV-12-00482-PHX-DGC |
| Plaintiff, | |
| v. | **ORDER** |
| Grace Xunmei Li, | |
| Defendant. | |

In this case, the government asks the Court to revoke the citizenship of Defendant Grace Xunmei Li, alleging that she procured it illegally and through misrepresentations and concealments.  The Court held a bench trial on August 14-15 and 18-19, 2014, at which 16 witnesses testified and several dozen exhibits were received in evidence.  After carefully considering all the evidence, the Court concludes that Ms. Li's citizenship must be revoked.

## I.    Background Facts.

The parties stipulate to most of the following facts.  Doc. 180 at 3-6.  Other facts set forth in this section have been found by the Court based on clear, unequivocal, and convincing evidence.

Grace Xunmei Li ("Li") was born in the People's Republic of China on November 28, 1969.  In 1991, Li's mother, who was residing in the United States, filed a Form I-130 Petition for Alien Relative on behalf of Li and her brother Richard.  Richard Li became a lawful permanent resident through this petition in October 1998.  Li came to the United States on a work visa at the age of 25 in 1995.

Li met Antony Bambrough, a naturalized U.S. citizen, shortly after her arrival, at a swimming pool in Fort Lee, New Jersey.  The couple became romantically involved and married two years later in February 1997.  They remained married for seven years, eventually divorcing in March 2004.

Li met Gang Chen ("Chen") in May 1997.  In late December 1998, Li became pregnant by Chen with their daughter, Daphne Li-Chen.  Daphne was born in Fort Lee on September 8, 1999.

In late 2000, Li and Chen moved to California with Daphne.  Li had accepted a job in San Jose, and Chen decided to pursue business opportunities there.  On February 7, 2002, their second daughter, Esther Jade Li-Chen, was born.  Although Li and Chen were still living in California at the time, Li returned to Fort Lee, where her mother was living, for the birth.

On July 5, 2002, Li, Chen, and others participated in a church wedding ceremony in San Jose, California.  The parties differ on whether Li and Chen intended this ceremony to be legally binding or merely an event staged to appease Chen's parents who were visiting from China.  Li was fully aware at the time that she was married to Bambrough.

Before the ceremony, Li and Chen went to the Santa Clara County Clerk's Office and applied for a marriage license.  After the ceremony, a copy of the license was sent to the County Recorder's Office, where it was duly recorded.

Two years later, and eight months after her divorce from Bambrough, Li filed a Form N-400 Application for Naturalization with the United States Citizenship and Immigration Services ("USCIS").  The form was filed on September 24, 2004.  On April 18, 2005, Li met with Officer Que-Hong Nguyen Cass for her naturalization interview.  Li's application for naturalization was approved that day and she became a U.S. citizen on May 5, 2005.

In 2008, the government charged Li and Chen with conspiracy to commit naturalization fraud under 18 U.S.C. § 371 and unlawful procurement of naturalization

1    under 18 U.S.C. § 1425.  In August 2009, Li pled guilty to violating 18 U.S.C. § 1015(a)

2    in the United States District Court for the Northern District of California.  This crime

3    involves knowingly making a false statement, under oath, in a matter relating to

4    naturalization or citizenship under the laws of the United States.

5    **II.     Li's Marriage to Chen.**

6            The primary factual dispute in this case concerns Li's wedding ceremony with

7    Chen.  The government contends that this event was intended to be – and was – a valid

8    and binding wedding ceremony.  Li contends that the event was staged to appease Chen's

9    family and was never intended by her or Chen to be a legal marriage.

10           The government must prove its case by "clear, unequivocal, and convincing

11   evidence."  *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012) (citing *United*

12   *States v. Dang*, 488 F.3d 1135, 1139 (9th Cir. 2007)).  The government's evidence must

13   not "leave the issue in doubt."  *Dang*, 488 F.3d at 1139.  Applying this high standard, the

14   Court finds that the July 5, 2002 wedding was understood by Li and Chen to be just what

15   it appeared to be – a legal marriage under the laws of the State of California.

16           This order will set forth some of the evidence that supports this finding.  The

17   Court will not attempt to describe all of the supporting evidence.

18           **A.     The Li-Chen Relationship.**

19           Li and Chen met in May 1997 when Chen attended a party in honor of Li's

20   graduation from college.  At the time, Li and Bambrough had been married only a few

21   months.  Li and Chen had a romantic liaison in December 1998 that resulted in Li's first

22   pregnancy.  Daphne was born nine months later in September 1999.  Ex. 22.  By this

23   time, it was clear that Li and Chen were involved in a romantic relationship.

24           Li added Chen to her bank account in November 1999.  Ex. 16.  Various witnesses

25   and exhibits established that Li and Chen lived together in Fort Lee, New Jersey, both at

26   an apartment at 2486 8th Street originally rented by Li's mother, and at a home purchased

27   by Li and her mother at 7 Hazlett Drive.  Li's marriage to Bambrough had, by this time,

28   grown cold.  Bambrough testified that he and Li had an intimate relationship only for a

few months after their marriage in February of 1997, and that she was no longer spending any time at his apartment by August of 1998.

## B.    Testimony of Friends.

Sherry Chen (no relation to Gang Chen) knew Li and her brother Richard in China.  When Li and Chen moved to California in 2000, they stayed for approximately one month in Sherry's house on Briarleaf Circle.  Li told Sherry that she and Chen had been together for a couple of years.  Li and Chen ultimately purchased a house across the street from Sherry at 1217 Briarleaf Circle.  Ex. 37.

Sherry saw Li and Chen daily after they purchased the house.  Sherry testified that Li and Chen seemed to love and adore each other.  This testimony, which the Court found credible, contradicts Li's assertion that Chen would come and go as he pleased and that she had no intention of forming a long-term relationship with him.

Sherry testified that she knew of Li and Chen's wedding plans before her first baby was born in November 2001.  Sherry had assumed that Li and Chen were already married, but Li told her they were planning to marry and that Li wanted their relationship to be legal.  Li never told Sherry that the marriage was not real or that it was being done simply to appease Chen's parents.

Sherry and her husband participated in Li and Chen's wedding on July 5, 2002. Sherry saw Li almost daily after the wedding.  Sherry testified that Li and Chen always called each other husband and wife.

Eleanor Shum also lived on Briarleaf Circle and was a neighbor and friend of Li, Chen, and Sherry.  Shum married Simon Ye on September 23, 2001.  Shortly after Shum's wedding, Li told Shum that Li planned to marry Chen and asked for information about the vendors who provided services at Shum's wedding.

Shum testified that she and Li's other friends were happy that Li and Chen were planning to marry.  She saw Li and Chen frequently both before and after the wedding, and testified that they seemed to have a good relationship.  Following the wedding – which Shum described as "lavish" – Shum heard Li and Chen refer to each other as

1    husband and wife.  Li never suggested to Shum that the wedding was somehow related to

2    Chen's parents or their visit from China.

3         Simon Ye also testified about his interactions with Li and Chen while they all

4    lived on Briarleaf Circle.  He said that he and others were happy when they learned of the

5    wedding plans.  Li and Chen never told him or their other friends that the wedding was

6    not real or was related in some way to Chen's parents.  Following the wedding, which Ye

7    attended, Ye believed that Li and Chen were legally married.  He testified that they

8    always referred to each other as husband and wife.[1]

9         **C.    Testimony of the Pastors.**

10        Pastor Randy Hunter, a Lutheran minister from Wisconsin, first met Li and Chen

11   in 2000 when they visited his church.  He came to know them because a longtime

12   parishioner in his church, Tammy Woller, married Li's brother, Richard.  Pastor Hunter

13   testified that he saw Li and Chen several times and even baptized their daughter, Daphne.

14        Pastor Hunter told Li and Chen they should get married.  Li responded that they

15   were planning to marry and eventually asked him to give a sermon at the wedding.

16   Because they were living in California at the time of the wedding, Pastor Hunter

17   introduced them to Pastor Jon M. Mahnke, a Lutheran minister in California.  Li and

18   Chen never told Pastor Hunter that they did not intend a legal marriage.

19        Pastor Hunter and his daughter flew to California for the wedding at the expense

20   of Li and Chen.  He delivered a sermon and described the wedding as an elegant affair.

21   Pastor Hunter testified that he would not have participated in the event had he known it

22   was intended to be a mock wedding ceremony.

23   _____

24        [1] There was time spent in the trial debating the meaning of the words "husband"
     and "wife" as they are used in Mandarin Chinese.  The defense presented evidence and
25   argument that the words actually used by Li and Chen are properly translated as "old
     girl" or "old man," and can as easily mean a boyfriend or girlfriend as a husband or wife.
26   The government sought to counter this evidence.  The Court does not find Li's argument
     persuasive, however, because Chinese-speaking friends of Li and Chen – specifically,
27   Sherry and Shum – testified that Li and Chen referred to each other as "husband" and
     "wife."  Whatever words Li and Chen were using, it appears that their Chinese-speaking
28   friends understood them to be married.  In addition, Li repeatedly referred to herself and
     Chen in English as "husband and wife," as will be shown below in citations to various
     documents.

1    Pastor John Mahnke met Li and Chen when they were referred by Pastor Hunter.

2    The meeting occurred a few weeks before the wedding.  He met with them several times

3    to review plans for the event.

4    Exhibit 43 is the script Pastor Mahnke prepared for the Li-Chen wedding.  Pastor

5    Mahnke testified that he reviewed the script with Li and Chen word-for-word before the

6    wedding ceremony.  This review included the portion of the script where Pastor Mahnke

7    declares that Li and Chen are "husband and wife, according to the ordinance of God, and

8    according to the laws of the State of California[.]"  Ex. 43 at USA5052.

9    Pastor Mahnke instructed Li and Chen to obtain a marriage license.  He told them

10   the license was needed for the marriage to be legal, and that he could not perform the

11   ceremony without it.   Pastor Mahnke identified Exhibit 41 as the marriage license

12   secured by Li and Chen and provided to him before the wedding.  The license states that

13   both Li and Chen had no previous marriages, even though both of them admit that they

14   had been married previously and were still married to their spouses in July 2002.  A

15   rehearsal for the wedding was held shortly before the actual marriage date, followed by a

16   rehearsal dinner at a Chinese restaurant.

17   Pastor Mahnke officiated at the ceremony on July 5, 2002.  He did not deviate

18   from the text in Exhibit 43.  When he asked Li and Chen if they accepted each other as

19   husband and wife, they said yes.  They exchanged rings, and Pastor Mahnke declared

20   them husband and wife according to the laws of the State of California.

21   Pastor Mahnke explained to Li and Chen before the wedding that he would send

22   the marriage certificate to Santa Clara County for recording.  This was his normal

23   practice, and he would not have allowed anyone else to discharge this duty.  Following

24   the wedding, Pastor Mahnke had the license signed by Li and Chen, as well as Li's

25   brother Richard and his wife Tammy as witnesses.  He then signed the document and

26   gave it to the church secretary to mail to the County.

27   Pastor Mahnke testified that the County issues only one copy of a marriage

28   license.  He did not give a copy of the license to Li or Chen or anybody else.

- 6 -

Pastor Mahnke would not have performed the marriage if he had known that Li and Chen intended it to be a mock ceremony. He testified that such an event would constitute mockery of God. He further testified that he could not see how Li or Chen could have been confused about the legal consequences of the marriage given his review with them of the wedding script, the specific words used during the ceremony, and his personal handling of the marriage license.

**D.    Other Wedding Details.**

Following the wedding, Li and Chen held a formal reception at the Silicon Valley Capital Club in downtown San Jose. The manager of the club, Bruce Mackenzie, testified that arrangements were made for 86 people to attend. The initial deposit for the reception was made in July of 2001, more than one year before the actual wedding date. Another substantial deposit was made a month before the wedding.

Various photographs of the wedding were introduced in evidence. Exs. 12, 46, 48, 49. Li wore a white wedding dress, Chen a black tuxedo. Li had several bridesmaids, dressed in blue gowns. The wedding included flowers, a disc jockey, and a wedding favor given to all the guests with the inscription "Our Love Is Here To Stay."

**E.    The Recorded Wedding License.**

Exhibit 41 is a copy of the wedding license for Li and Chen. In addition to being on a form provided by the County of Santa Clara, the exhibit shows that it was accepted for registration by the County on July 11, 2002, apparently after it was received in the mail from Pastor Mahnke's secretary. The defense does not dispute that the license was recorded. The defense instead argues that Li and Chen did not know the license would be recorded. For several reasons, the Court cannot accept this claim.

First, Pastor Mahnke told Li and Chen that a marriage license was needed for a valid wedding, and they obtained one from the County Recorder's office. Pastor Mahnke also told Li and Chen that he would send it back to the County after the wedding.

Second, Li testified that either Chen or her brother Richard was tasked with retrieving the marriage license from Pastor Mahnke to ensure that it would not be

recorded, but this testimony contradicts Pastor Mahnke's testimony that he specifically told Li and Chen that the license was necessary and that he would send it in for recording. It also contradicts his testimony that no one asked him for the license after the ceremony.[2]

Third, Li and a later husband, Steve Greschner, testified that Li possessed an unrecorded original of the marriage license when she was charged criminally in 2008. Greschner and Li testified that Li, upon learning of the criminal charges, retrieved the unrecorded original from a file and showed it to Greschner as proof that she had never been legally married to Chen. Greschner and Li testified that they then obtained a copy of the recorded license from Santa Clara County, compared it to the original in Li's possession, and, discouraged, placed both documents in an envelope in Greschner's file. They testified that these two documents mysteriously disappeared following an IRS raid on Greschner's house in 2010, and therefore were not available for this litigation.

This account cannot be squared with the evidence. Li's criminal defense attorney, Norm Keyt – whom the Court found to be very credible – testified that the validity of the Li-Chen marriage was the "big question" in the 2008 criminal case. His investigation confirmed that a copy of the marriage license had been filed with Santa Clara County. He also testified that neither Li nor Greschner ever told him that they had an original unrecorded version of the marriage license. In other words, the one document that would have clearly corroborated Li's claim that she never intended to marry Chen was never so much as mentioned to her criminal defense attorney. This fact seriously undermines Li's claim about the unrecorded license. Had it existed, it would have been the first document Li and Greschner would have provided to Keyt.

---

[2] Richard Li testified during his deposition that he did not recall being asked to retrieve the wedding license. In one answer he was asked about a "license," in another about a "certificate." During trial, the defense sought to admit an affidavit from Richard which said he was asked to retrieve the license after the marriage. The Court denied admission of the affidavit on hearsay grounds. The defense then sought to introduce the affidavit under the residual hearsay exception in Rule 807. The Court denied the request, noting that the affidavit could not be viewed as reliable given its contradiction of Richard's previous deposition testimony. The Court now recognizes that the deposition testimony is somewhat ambiguous because it refers both to a license and a certificate. The Court also refused to admit the affidavit, correctly, because the defense did not attempt to procure Richard's attendance and testimony at trial. *See* Fed. R. Ev. 807(a)(3).

IRS Agent Thuyet Phong Le testified about the IRS search of Greschner's home in 2010.  She testified that documents seized from the house were taken to locked storage at the IRS office where they remain to this day.  She testified that only she and another agent have had access to the documents.  At the request of the government lawyers in this case, she personally reviewed every page of the documents seized from Greschner's home and did not locate the unrecorded marriage license that Greschner and Li claim were in their possession and seized during the search.  The Court found her testimony to be thoroughly credible and directly contrary to the testimony of Li and Greschner that the unrecorded marriage certificate was in Li's possession and taken in the search.

Finally, Pastor Mahnke testified that Santa Clara County issues only one copy of each marriage license.  That copy was clearly recorded (Ex. 41), leaving no unrecorded copy to have been in Li's or Greschner's files.

**F.     Li and Chen Held Themselves Out as Husband and Wife.**

For at least four years following their marriage, Li and Chen held themselves out as husband and wife in a number of legal documents.  These included verified pleadings filed in a civil lawsuit (Ex. 55 at USA4177), joint tax returns filed as husband and wife (Exs. 71, 72), and a series of real property deeds and loan applications.  In one of these documents – a consent for release of information from the Social Security Administration signed in November 2005 – Grace Li wrote the word "wife" in describing her relationship to Chen.  Doc. 58.  In others, Li and Chen checked boxes or signed forms explicitly identifying themselves as "husband and wife."  For example, when they sold their house at 1217 Briarleaf Circle in May 2003, Li and Chen represented themselves on the grant deed as husband and wife.  Ex. 40.  When they applied for residential loans for their house at 5664 Morningside Drive in November 2005 and January 2006, Li and Chen identified themselves as married.  Exs. 57, 60.  And when they sold that house in May 2006, they again listed themselves on the grant deed as husband and wife.  Ex. 59.

**G.     Plea Agreement.**

Li pled guilty to the crime of making a false statement in relation to naturalization

1    in violation of 18 U.S.C. § 1015(a).  A copy of her plea agreement was admitted in

2    evidence as Exhibit 94.  Attorney Norm Keyt testified that he reviewed the agreement

3    with Li carefully before she signed it.  He explained to her that a "knowing" false

4    statement means that she knew the statement was false when she made it.[3]

5        In the plea agreement, Li confirmed that she claimed to be "divorced" in her

6    citizenship application when in fact she was married Chen, that she claimed to have been

7    married only once when in fact she had been married twice, and that she claimed never to

8    have been married to more than one person at a time when in fact she was married to

9    Chen and Bambrough at the same time.  Ex. 94 at USA4544.  Li also confirmed in the

10   agreement that she had adequate time to discuss her case and the evidence with her

11   attorney, and that her decision to enter into the plea agreement was knowing and

12   voluntary.  Li signed the plea agreement on August 14, 2009.

13       Li appeared before United States District Court Judge Jeremy Fogel the same day.

14   After being placed under oath, Li confirmed that she understood the plea agreement.  The

15   prosecutor then described the various false statements admitted in the plea agreement,

16   and Judge Fogel asked:  "Did you make the false statements?"  Li responded:  "I agree

17   with them."  She then pled guilty.  Ex. 95 at USA4470.

18       At her sentencing hearing on December 16, 2009, Li equivocated on whether she

19   had ever married Chen.  Ex. 96.  She asserted that the marriage was not intended to be

20   legally binding and that she did not make false statements regarding the marriage.  After

21   a lengthy colloquy with the judge, Li, who again was under oath, admitted that she made

22   "a false statement."  Ex. 96 at GL75.  She was sentenced to probation.

23       The Court finds that Li knowingly and voluntarily admitted in her plea agreement

24   and during her plea colloquy that she had lied about her marriage to Chen.  Although she

25   later backtracked on these admissions during the sentencing, the plea agreement and plea

26   colloquy strongly corroborate the Court's conclusion that Li was legally married to Chen.

27   _____

28       [3] Defense counsel confirmed at trial that Li waived the attorney-client privilege
     with respect to her communications with Keyt.

1

**H.     Other Credibility Issues.**

2       During the course of the trial, the Court came to doubt Li's credibility for several

3   other reasons.  The Court will review only a few.

4       Li testified at trial that she did not understand at the time of her wedding that

5   marriages could be formalized in a church.  She explained that weddings in China are

6   formalized at government offices, and that she thought a wedding ceremony at a church

7   was not legally binding.  For several reasons, the Court does not believe this claim.

8       First, Li attended the church wedding of her brother Richard and her sister-in-law,

9   Tammy.  That wedding, like Li's own, occurred at a Lutheran church.  Li did not testify

10  that she ever doubted that Richard and Tammy were legally married.

11      Second, Pastor Mahnke specifically told Li and Chen that they should obtain a

12  marriage license from the county office.  The script of the wedding, which he reviewed

13  with them word-for-word before the marriage and recited again during the wedding,

14  specifically stated that they were married "under the laws of the State of California."

15      Third, Li testified that the clerk at the county office explained that the license

16  would be valid when it was returned for recording.  This clearly indicated that the

17  wedding at the church would be a legally binding event.  In fact, at another point in her

18  testimony, Li claimed that she thought she could avoid the legal effect of the wedding

19  simply by not returning the license.  Such a thought never would have crossed her mind if

20  she truly believed that she could not be legally married in a church.

21      The Court also came to doubt Li's credibility because her testimony at trial about

22  the wedding was vague and evasive.  When pressed for details or explanations regarding

23  the wedding and her view of it, Li became perplexed, failed to respond to questions, and

24  often fell back to central defense positions.  The Court reviewed the deposition testimony

25  of Chen and found it similarly vague and evasive on the subject of the wedding.

26      Finally, the Court finds Li's testimony that she never viewed herself as married to

27  Chen to be unbelievable in light of an abundance of evidence to the contrary:  testimony

28  from close friends, family members, and pastors concerning Li's statements and actions

1    with respect to the wedding; the recorded marriage license; the elaborate and costly

2    wedding planned months in advance; her post-wedding statements to friends and family

3    that she and Chen were husband and wife; her statements in numerous legal documents

4    that they were husband and wife; and the sworn admissions in her criminal case.

5    **III.    The Government's Claims.**

6        The government initially asserted six counts for denaturalization.  In an order filed

7    on March 6, 2014, the Court granted summary judgment for Li on Counts II and III.

8    Doc. 174.  The government sought to prove the four remaining counts at trial.

9        **A.    Count I.**

10       Congress has authorized federal prosecutors to file civil actions against a

11   naturalized citizen "for the purpose of revoking and setting aside the order admitting such

12   person to citizenship and cancelling the certificate of naturalization on the ground that

13   such order and certificate of naturalization were illegally procured or were procured by

14   concealment of a material fact or by willful misrepresentation."  8 U.S.C. § 1451(a).  In

15   Count I, the government seeks to denaturalize Li under the first part of this statute,

16   alleging that her citizenship was "illegally procured."

17       The Supreme Court has held "that there must be strict compliance with all the

18   congressionally imposed prerequisites to the acquisition of citizenship.  Failure to comply

19   with any of these conditions renders the certificate of citizenship 'illegally procured,' and

20   naturalization that is unlawfully procured can be set aside."  *Fedorenko v. United States*,

21   449 U.S. 490, 506 (1981) (citing 8 U.S.C. § 1451(a)) (case citations omitted).

22       The government alleges in Count I that Li did not comply with the congressionally

23   imposed prerequisite of having a good moral character during a time period established in

24   8 U.S.C. § 1427(a)(3).  For Li, the statutory period began on September 24, 1999 and

25   ended on the day of her naturalization, May 5, 2005.  The basis for the government's

26   assertion that she was not of good moral character during this period is 8 U.S.C.

27   § 1101(f)(6), which states that a person lacks good moral character if he or she "has given

28   false testimony for the purpose of obtaining any benefits under this chapter."  Count I

alleges that Li gave false testimony during her naturalization interview on April 18, 2005. Specifically, the government claims that she falsely stated she had no children, her marital status at the time was "divorced," she had been married only once, and she had never committed a crime for which she had not been arrested.

To prove this claim, the government must show that Li gave false testimony "orally and under oath" and did so with a "subjective intent to deceive for the purpose of obtaining immigration benefits." *Ramos by I.N.S.*, 246 F.3d 1264, 1266 (9th Cir. 2001). Section 1101(f)(6) does not impose a materiality requirement. *Kungys v. United States*, 485 U.S. 759, 779 (1988). "[S]tatements made by an applicant in a naturalization examination are 'testimony' within the meaning of 8 U.S.C. § 1101(f)(6)." *Bernal v. I.N.S.*, 154 F.3d 1020, 1023 (9th Cir. 1998).

The parties agree that Li made oral statements to Officer Cass on April 18, 2005, and that the interview occurred during the statutory time period. Thus, the questions to be resolved on this claim are whether Li gave her statements under oath, whether the statements were false, and whether she had a subjective intent to deceive for the purpose of obtaining an immigration benefit.

### 1.      Was Li Placed Under Oath?

Officer Cass testified that she does not recall the interview with Li. She also testified, however, that she rigorously follows standardized practices during every naturalization interview.

The Court found Officer Cass to be a very credible witness. At the time of Li's interview, Officer Cass had been a District Adjudication Officer with USCIS for approximately one year. Prior to that year, Officer Cass obtained a bachelor's degree and completed a six week training academy for immigration officers. During the more than ten years since she joined USCIS, Officer Cass' overall performance rating has been "outstanding," with no individual rating lower than "excellent."

Officer Cass testified that naturalization interviews are formal events. She performs each interview the same way. She does so, she explained, for "accountability,

1    consistency, and fairness."   Officer Cass explained that she begins each interview by

2    escorting the applicant into her office and, before the applicant sits down, placing the

3    applicant under oath.   She does so by asking the applicant to raise his or her right hand,

4    and then asks "do you swear to tell the truth today?"   If the applicant says yes, the

5    interview proceeds.

6          From this testimony, the Court concludes that Li was placed under oath during her

7    interview.   Defense counsel agreed during trial that the specific oath used by Cass is

8    sufficient for the applicant's statements to be sworn testimony.[4]

9                    **2.        Were False Statements Made In The Interview?**

10         Officer Cass follows several consistent procedures in her interviews.   She reviews

11   the applicant's N-400 application and makes red check marks and other annotations as

12   she questions the applicant.   The check marks are made in three circumstances:   when

13   Officer Cass reviews and recites out loud basic biographical information such as name

14   and date of birth, when she confirms information on the form from another source such as

15   the applicant's passport, and when she asks the applicant a question.   Officer Cass

16   testified that she does not ask applicants every question on the N-400, but she does ask at

17   least one question in every section of the document.   If an applicant expresses confusion

18   about any question, Officer Cass provides an explanation.   When Officer Cass asks a

19   question and confirms information contained on the N-400, she makes a red check-mark

20   next to the answer.

21         This practice of marking the N-400 application in red ink is USCIS policy.

22   Exhibit 61 is a USCIS memorandum regarding procedures for naturalization interviews.

23   It states that "officers must check off or circle in **RED** ink all N-400 questions which are

24   asked and answered during the interview.   **In order to clearly identify the applicant's**

_____

26         [4] Li's expert witness, Robert Mautino, is a California attorney who has handled
27   many immigration cases and served in various bar leadership positions.   He testified that
     he has seen immigration officers fail to place applicants under oath during naturalization
     interviews.   He also testified, however, that he has never attended an interview by Officer
28   Cass.   The Court found credible her testimony that she always places applicants under
     oath.

1    response, the check or circle marks **must be made next to the N-400 answers.**"

2    Ex. 61 at USA6737 (bold type and capitalization in original).  The USCIS field manual

3    also reflects the policy of marking in red ink the questions that are asked during the

4    interview.  Ex. 81 at USA4001.  Officer Cass testified that she always complies with

5    these directives.

6        Li's N-400 application was admitted in evidence as Exhibit 79.  It contains red

7    check marks on a number of questions.   The focus for purposes of this case is on

8    questions concerning Li's marital status and children.

9                    **a.    Questions About Martial Status.**

10       Part 8, question A of the application asks:   "How many times have you been

11   married (including annulled marriages)?"  Ex. 97 at USA161.  Li wrote the number 1 into

12   the box where an answer was required, indicating she had been married only once.  This

13   was not true.  Li had been married twice, to Bambrough and Chen, and the marriages had

14   overlapped by several years.

15       Next to Li's answer is a red check mark.  *Id.*  Officer Cass testified that the check

16   mark shows she asked Li how many times she had been married and placed the mark next

17   to Li's answer after hearing Li's response.  Officer Cass testified that she asks every

18   applicant how many times they have been married because this question relates to both

19   good moral character and the lawfulness of the applicant's permanent resident status.  If

20   Li had provided information about her second marriage to Chen, Officer Cass testified

21   that she would have changed Li's written answer from one to two.  She would also have

22   filled out Part 8, question B with the information regarding Chen, to whom Li was then

23   married.

24       In Part 3, question G, Li was asked "What is your current marital status?"  Ex. 79

25   at USA159.  Li had the choice of checking boxes for single, married, divorced, or

26   widowed.  Although she was married to Chen at the time, she checked "divorced."  A red

27   check mark appears next to this answer, showing that Officer Cass confirmed this answer

28   during her interview with Li.

If Li had disclosed her marriage to Chen, Officer Cass testified that she would have asked a series of questions about the marriage.  These would have included when Li's previous marriage to Bambrough ended and whether any children had been born to Li and Chen.  These questions bear on good moral character and the lawfulness of Li's permanent resident status.  If Li had disclosed that her marriage to Chen overlapped her marriage to Bambrough, or that she had a romantic relationship with Chen during her marriage to Bambrough, her answers would have raised questions about possible bigamy or a possible affair tending to destroy a marriage, both of which bear on good moral character under the applicable statutes and regulations.  Officer Cass testified that if Li had disclosed her marriage to Chen it would have resulted in Officer Cass not approving her citizenship application that day.  Instead, Officer Cass would have continued the case and referred the file to another unit for further investigation.

### b.    Questions About Children.

Part 9 of the N-400 application is titled "Information About Your Children." Ex. 79 at USA164.  Question A asks:  "How many sons and daughters have you had? For more information on which sons and daughters you should include and how to complete this section, see the Instructions."  *Id.*  Li left the box next to this question blank.

Officer Cass testified that she always asks applicants about blank answers. Because the block concerning the number of her children was blank, and the box below this section concerning the names, birthdays, and other information about children was also blank, Officer Cass testified that she would have asked Li about these subjects. Officer Cass drew a long red line through the box requiring the information about Li's children.  *Id*.  Officer Cass testified that this line was drawn to show that Li said she had no children.[5]

---

[5] The defense noted that Officer Cass added information to a blank box in Part 1, question D.1 of the application, but added no information to the blank boxes regarding children.  But the questions are quite different.  Part 1, question D.1 asks whether the applicant is seeking a name change and has boxes for "yes" and "no," neither of which were checked by Li.  Officer Cass checked "no" because the question required one

Officer Cass testified that she asks a simple and specific question in every naturalization interview: "Do you have any children?"  If the applicant expresses confusion, Officer Cass will pursue it further.  If Li had questions about whether she should list Daphne and Esther, Officer Cass would have explained to Li that she must list all her children.

Had Li disclosed Daphne and Esther, Officer Cass would have written the number 2 into the Part 9, question A box, and would have added biographical information about each child in the large box below.  Officer Cass also would have asked who fathered the children, whether Li was married when they were born, and whether they were conceived and born during Li's marriage to Bambrough.  These questions would have been material to Li's good moral character and the lawfulness of her permanent resident status, Cass explained.  If Li had disclosed the children, Officer Cass would not have approved the application that day; she would have referred the file for further investigation.

Li testified that she left the boxes blank because she was confused by the question about her children and was not seeking immigration benefits for them.  For several reasons, the Court cannot accept this explanation as true.

First, Officer Cass always asks about children during the interview and provides explanations when there is confusion.  Li's alleged confusion therefore would have been resolved during the interview and the information about Daphne and Esther would have been added to the application by Officer Cass if Li responded truthfully.

Second, the question on the application is simple and direct: "How many sons and daughters have you had?"  It is not confusing.  The title of the section – "Information About Your Children" – is similarly clear.  Although the defense noted that a more complete explanation of this question has been added to later versions of the N-400, the Court does not find the question confusing.  In addition, following the question is a directive that the applicant can obtain more information on what to disclose by looking at

answer or the other.  The questions regarding children, by contrast, did not give "yes" or "no" alternatives, but instead required information about children of the applicant.  Where there were no children, as Li represented, the boxes were appropriately left blank.

1   the instructions.  Officer Cass testified that Li's application was obtained and printed

2   from the Internet, and that the Internet version is accompanied by instructions.

3       Third, Li is intelligent and well-educated.  She graduated magna cum laude from

4   Long Island University with a degree in journalism.  Ex. 1 at USA8004.  She received

5   "A" grades in classes such as English composition, literature, and magazine article

6   writing.  *Id.* at USA8004-06.  She used the word "entrepreneurship" on her N-400

7   application and spelled it correctly.  Ex. 79 at USA160.  Following graduation, Li held

8   responsible positions for sophisticated companies, including acting as a project director.

9   Steve Greschner, her third husband, testified at trial that he was initially attracted to Li,

10  among other reasons, because she was "intelligent."  Pastor Hunter testified that several

11  years prior to her naturalization interview Li spoke "excellent" English.  Given these

12  indicators of education and intelligence, all of which existed before her interview with

13  Officer Cass, the Court does not find credible Li's testimony that she was confused by the

14  question about her children.

15      The defense suggested during cross-examination and in closing argument that

16  Officer Cass' testimony is unreliable.  The defense elicited testimony that Officer Cass

17  conducts 13 interviews per day, each lasting about 25 to 30 minutes.  The defense

18  suggested that she could not, in that short amount of time, retrieve Li from the waiting

19  area, administer the oath, provide initial explanations, review all of the questions with red

20  marks on Li's application, review Li's passport, administer a history exam, administer an

21  English test, and perform some data entry.  But Officer Cass was firm and credible in her

22  testimony that she reviewed each question with a check-mark, particularly those

23  concerning marital status and children.  She testified, incidentally, that the history test

24  consists of ten oral questions and the English test consists of writing one sentence.

25              **c.    Interview Summary.**

26      The government has shown by clear, unequivocal, and convincing evidence that

27  Officer Cass asked Li whether her marital status at the time of the interview was

28  "divorced" (Part 3, question G), how many times she had been married (Part 8, question

A), if she had ever committed a crime for which she was not arrested (Part 10, question 15), and if she had any children (Part 9, question A), and that Li provided false answers to each of these questions.   The Court finds that Li made at least four false oral statements to Officer Cass.

### 3.    Did Li Have The Required Subjective Intent?

As already noted, Li fully understood that she was married to Bambrough when she married Chen.  She also understood, of course, that she had two children.

"[D]irect proof of one's specific wrongful intent is rarely available."  *United States v. Dearing*, 504 F.3d 897, 901 (9th Cir. 2007) (internal quotes omitted).  The requisite intent "may be inferred by the trier of fact from all the facts and circumstances." *United States v. Marabelles*, 724 F.2d 1374, 1379 (9th Cir. 1984).  In light of the evidence presented at trial, the Court concludes that Li's only reason for concealing facts about her marriage and children on her N-400 application and during her interview with Officer Cass was to obtain the immigration benefit of citizenship.  That was the reason for the application and the interview, and the Court concludes that the well-educated and intelligent Li understood that disclosure of a bigamous marriage and children fathered by Chen could create naturalization problems.  The Court cannot conclude that Li failed to disclose her marriage or children through ignorance or mistake.

Supporting this conclusion is the fact that Li had lied before to immigration authorities.  She and Bambrough jointly filed a Form I-751 Petition to Remove the Conditions on Residence with the INS on July 10, 2000.  Ex. 6.  The petition falsely stated that Li was living at Bambrough's apartment in Fort Lee, New Jersey, when in fact she had not lived there since August 1998 and was at the time living with Chen.

### 4.    Count I Conclusion.

The government has shown that Li made at least four false statements during her oral interview with Officer Cass, that she was placed under oath, that she had the subjective intent to deceive the government for the purpose of obtaining an immigration benefit, and that the false statements were made during the statutory time period.  The

1    Court accordingly finds that Li did not satisfy the good moral character requirement of 8

2    U.S.C. § 1427(a)(3) and that her naturalization was illegally procured under 8 U.S.C.

3    § 1451(a).

4           **B.     Count IV.**

5           Count IV also relies on the "illegally procured" prong of 8 U.S.C. § 1451(a).  The

6    government again alleges that Li lacked good moral character within the statutory period.

7    The government relies in this count on a regulation which states that an applicant "shall

8    be found to lack good moral if, during the statutory period, the applicant … [c]ommitted

9    unlawful acts that adversely reflect on the applicant's moral character[,]" unless the

10   applicant establishes "extenuating circumstances."  8 C.F.R. § 316.10(b)(3).  Count IV

11   alleges that Li committed the crime of bigamy within the statutory period, that this crime

12   adversely reflects on her moral character, and that Li cannot establish extenuating

13   circumstances for the crime.

14          To be guilty of bigamy, Li and Chen must each have consented to a contract of

15   legal marriage on July 5, 2002 within the meaning of California Family Code § 300, and

16   Li must have known at the time that she was married to another person.  *See* Cal. Penal

17   Code § 281; Cal. Family Code § 300.  California courts also hold that "wrongful intent is

18   an element of the crime of bigamy."  *People v. Gaul-Alexander*, 32 Cal. App. 4th 735,

19   747, 38 Cal. Rptr. 2d 176, 183 (Ct. App. 1995).  One does not have the requisite intent

20   for the crime of bigamy "if he had a bona fide and reasonable belief that facts existed that

21   left him free to remarry."  *People v. Vogel*, 46 Cal. 2d 798, 801, 299 P.2d 850, 852

22   (1956).

23          On the basis of the evidence reviewed earlier in this order, the Court finds that Li

24   knowingly consented to a contract of legal marriage on July 5, 2002, and that she knew at

25   the time she was legally married to Bambrough.  The Court further finds that Li had the

26   wrongful intent to commit bigamy as the evidence leaves no room for a bona fide or

27   reasonable belief by Li that she was free to remarry Chen.  The government has proven

28   these facts by clear, unequivocal, and convincing evidence.

The Court further finds that Li's crime of bigamy adversely reflects upon her moral character.  California courts and the Ninth Circuit have held that bigamy is a crime involving moral turpitude.  *Vogel*, 46 Cal. 2d 798; *Gonzales-Martinez v. Landon*, 203 F.2d 196, 197 (9th Cir. 1953).  Although the offense was not sufficient for an absolute statutory revocation of citizenship as found in the Court's summary judgment ruling, the crime is nonetheless a crime involving moral turpitude and therefore reflects adversely on Li's moral character.

Li has not presented extenuating circumstances with respect to this crime.  Her defense is that she never intended to marry Chen.  As explained above, the Court finds this defense unpersuasive.  Li does not otherwise explain why the crime of bigamy was justified by extenuating circumstances.  She does not assert that she was unable to obtain a divorce from Bambrough, that she was pressured to enter the marriage with Chen, or that other extenuating circumstances justified her knowing marriage to Chen.

The Court concludes that Li lacked good moral character within the meaning of the regulation quoted above, that this lack of moral character occurred during the statutory period, and that Li's citizenship was therefore "illegally procured" within the meaning of 8 U.S.C. § 1451(a).

**C.    Count V.**

Count V asserts that Li's citizenship was "illegally procured" within the meaning of 8 U.S.C. § 1451(a) because she lacked good moral character during the statutory period.  Count V is based on a regulation stating that an applicant lacks good moral character if he or she "had an extramarital affair which tended to destroy an existing marriage."  8 C.F.R. § 316.10(b)(3)(ii).  The government alleges that Li's affair with Chen had a tendency to destroy her marriage to Bambrough.

The parties have cited little authority explaining when an affair "tends" to destroy an existing marriage.  The relevant statute formerly referred to adultery that "tended" to destroy a marriage, and regulations interpreting that statute remain in place today.  The adjudicator's field manual for the USCIS addresses that requirement and provides some

guidance:  "If the lawful marriage *ceased to be viable and intact* before the commission of the adultery, such sexual misconduct without cohabitation does not support a finding of lack of good moral character."  INS Adj. Field Manual ch. 73.6 (2006) (emphasis added).  A case decided before the reference to "adultery" was eliminated from the statute similarly held that the statute "required extra-marital intercourse which tends to destroy *an existing, viable marriage*."  *Moon Ho Kim v. INS*, 514 F.2d 179, 181 (D.C. 1975) (emphasis added).  In *Etape v. Napolitano*, 664 F. Supp.2d 498, 516 (D. Md. 2009), the court held that even though the petitioner had multiple affairs while married to his former spouse, which produced multiple children from other women, this did not tend to destroy his marriage because his former spouse testified that she and petitioner had stopped living together long before the affairs and that his relations with other women had nothing to do with why they were eventually divorced.

These authorities suggest that the element of "tended to destroy an existing marriage" can be satisfied only if the marriage was at least viable before the affair occurred.  In this case, Bambrough testified that he and Li stopped living together within a few months of their marriage in February 1997.  By mid-1998, Li was not spending any time at his apartment, they had no physical relationship, and Li's mother did not approve of the marriage.  Nor was Bambrough providing financial support to Li.  Thus, it appears that Li's marriage to Bambrough was severely strained, if not irretrievably broken, before her affair with Chen commenced in December of 1998.

When asked about the reasons for the failure of his marriage, Bambrough identified Li's mother's disapproval of the marriage, Li's cultural ties to her mother, and "evidently" her relationship with "other people."  Although this evidence suggests that the Li-Chen relationship did have some effect on the marriage, the Court cannot find that the government has shown by clear, unequivocal, and convincing evidence that the marriage was viable at the time Li commenced her affair with Chen, or that the affair tended to destroy a viable marriage.  The government has not met its heavy burden of proof on Count V.

1      **D.     Count VI.**

2          Count VI relies upon a different prong of 8 U.S.C. § 1451(a).  The government

3   alleges that her citizenship was "procured by concealment of a material fact or by willful

4   misrepresentation."  8 U.S.C. § 1451(a).  To establish this basis for revocation, the

5   government must prove that (1) Li misrepresented or concealed some fact, (2) her

6   misrepresentation or concealment was willful, (3) the fact was material, and (4) Li

7   procured citizenship as a result.  *Kungys*, 485 U.S. at 767.  Proof of intent to deceive is

8   not required.  *Forbes v. INS*, 48 F.3d 437, 442 (9th Cir. 1995) (citing *Espinoza-Espinoza*

9   *v. INS*, 554 F.2d 921, 925 (9th Cir. 1997)).  Knowledge of the falsity of a representation

10  is sufficient.  *Id.*

11         The Ninth Circuit has explained that "a misrepresentation is material if it has a

12  natural tendency to produce the conclusion that the applicant was qualified for

13  citizenship.  A misrepresentation or concealment can be said to have such a tendency if

14  honest representations would predictably have disclosed other facts *relevant to the*

15  *applicant's qualifications*."  *United States v. Puerta*, 982 F.2d 1297, 1303-04 (9th Cir.

16  1992) (citing *Kungys*, 485 U.S. at 783-84) (emphasis added; internal quotes omitted).

17         Count VI alleges that Li misrepresented her marital status and concealed the

18  existence of her children in her N-400 application and her interview with Officer Cass.

19  For the reasons set forth above, the Court finds that Li did misrepresent and conceal these

20  facts, and that the misrepresentation and concealment were willful.  The Court must

21  therefore decide whether the true facts would have been material and whether Li

22  procured citizenship as a result.

23         The misrepresented and omitted facts clearly were material.  As Officer Cass

24  explained, marital status and the existence of children are important in the naturalization

25  process.  The N-400 application includes specific questions about them, and immigration

26  officers are instructed to ask about them during interviews.  This is because both areas of

27  inquiry can bear upon the good moral character requirement and whether the applicant

28  properly procured his or her permanent resident status.  Honest responses in these two

areas – Li's disclosure that she was married to Chen and had two children by him – would have disclosed facts "relevant" to her qualifications for citizenship.  *Puerta*, 982 F.2d at 1303-04.  Indeed, Ms. Li's own expert, Mr. Mautino, conceded during cross-examination that disclosure of Li's children could have affected the determination of good moral character.  He also conceded that Li's marriage to Chen, if disclosed, would have been relevant.  Li's misrepresentations and omissions were material.

The Court also concludes that Li procured her citizenship as a result of these misrepresentations.  "[O]nce the government establishes that the misrepresentation or concealment was 'material,' a presumption arises that the citizen who obtained naturalization was disqualified."  *United States v. Mohalla*, 545 F. Supp. 2nd 1035, 1043 (C.D. Cal. 2008) (citing *Kungys*, 485 U.S. at 777); *see also United States v. Latchin*, 554 F.3d 709, 714 (7th Cir. 2009) ("a material falsehood raises a presumption of ineligibility . . . [if] the government produces evidence sufficient to raise a fair inference of ineligibility"); *Monter v. Gonzales*, 430 F.3d 546, 554 (2d Cir. 2005) ("government's showing of 'materiality' creates a presumption that the petitioner was disqualified from naturalization").  The burden then shifts to the defendant to show "that he or she did in fact meet the statutory qualification that the misrepresentation had a tendency to influence."  *Monter*, 430 F.3d at 554-55 (citing *Kungys*, 485 U.S. at 777).

Li has not presented sufficient evidence to rebut the presumption.  Li's only evidence on this issue came from Mr. Mautino.  His opinion, however, was based on an assumption that Li did not intend to deceive the government during her interview.  This assumption is faulty for reasons stated above – Li knew she was legally married to Chen while married to Bambrough and that she had children by Chen, and yet she knowingly withheld this information on her application and during her interview.  Because the predicate for Mr. Mautino's opinion is not present, his opinion is not reliable.

In addition, Mr. Mautino candidly admitted that disclosure of Li's children and her marriage to Chen would have been relevant to the good moral character inquiry.  Mautino provided no other basis for the Court to conclude that disclosure of the marriage and

children would not have adversely affected Li's efforts to become a U.S. citizen.

In light of the presumption raised by the materiality of the misrepresented and omitted facts, and Li's failure to rebut that presumption, the government has shown that Li procured her citizenship by misrepresenting her marital status and concealing the existence of her children.  The government has satisfied the requirements of the second prong of 8 U.S.C. § 1451(a).

**IV.    CONCLUSION**.

This case was professionally litigated and hard-fought.  Defense counsel mustered much evidence and made good arguments.  Among other things, defense counsel appealed to the Court's sense of justice, asking that the Court not revoke Li's citizenship or separate her from her citizen children.  The Court understands and feels the force of these arguments.  The Court concludes, nonetheless, that the government has met its burden of proof on Counts I, IV, and VI by clear, unequivocal, and convincing evidence, with no legitimate room for doubt.  The Supreme Court has instructed that "once a district court determines that the government has met its burden of proving that a naturalized citizen obtained his citizenship illegally or by willful misrepresentation, it has no discretion to excuse the conduct." *Fedorenko,* 449 U.S. at 517.

**IT IS ORDERED:**

1.      Grace Xunmei Li's United States citizenship will be revoked pursuant to the authority of 8 U.S.C. § 1451(a).

2.      A hearing will be held on **September 18, 2014, at 3:00 p.m.** for the purpose of determining what measures should be taken by the Court in light of this decision.  The government shall file a short memorandum (not to exceed 5 pages) on or before **September 11, 2014** setting forth the measures it believes the Court should take.  Defendant shall file a response (not to exceed 5 pages) on or before **September 15, 2014.**

3.      This order does not constitute a final judgment for purposes of appeal.  The Court will enter a final judgment after the September hearing, at which point the time for appeal will begin to run.

Dated this 26th day of August, 2014.

David G. Campbell
United States District Judge